1

2

3

4

5          IN THE UNITED STATES DISTRICT COURT FOR THE

6                EASTERN DISTRICT OF CALIFORNIA

7

8   ESTATE OF STEPHEN O.        )        No. CV-F-06-1690 OWW/GSA
    ESQUIVEL,                   )
9                               )        MEMORANDUM DECISION GRANTING
                                )        IN PART AND DENYING IN PART
10                              )        DEFENDANTS' MOTION FOR
                 Plaintiff,     )        SUMMARY JUDGMENT (Doc. 34)
11                              )
            vs.                 )
12                              )
                                )
13  SANGER POLICE OFFICER       )
    MANUEL CHAVEZ, et al.,      )
14                              )
                                )
15               Defendants.    )
                                )
16  _____)

17       On November 21, 2006, Plaintiff Estate of Stephen O.

18  Esquivel (Decedent), represented by Kevin Little, filed a

19  Complaint for Damages and Wrongful Death pursuant to 42 U.S.C. §

20  1983 and 1985 against City of Sanger Police Officers Manuel

21  Chavez and Eric Grijalva, City of Sanger Police Sergeant Fred

22  Sanders, and the City of Sanger.[1]  The individual defendants are

23  sued in their personal and official capacities.  It is alleged

24  _____

25       [1]The Complaint also named the children of Decedent and his
    mother as Plaintiffs.  These Plaintiffs were dismissed by Order
26  filed on March 6, 2008.

                                1

that Defendants Chavez and Grijalva used deadly force on Decedent

and that Defendant Sanders "was the supervisor on scene who

condoned and failed to prevent their actions."  The Complaint

alleges:

> 7.  On January 29, 2005, Magdalena Granados,
> along with her friend, Stephanie Aguayo,
> picked up decedent from his residence at
> 11850 E. American, Del Rey, California ....
>
> 8.  Decedent and Granados went to a Shell
> station in Sanger, California.  An argument
> ensured between decedent and Granados.
> Granados called 911 twice, hanging up the
> first time and then falsely reporting that
> decedent was abusing her.
>
> 9.  The defendant officers responded to the
> 911 call.  As the defendant officers
> approached Granados' vehicle, decedent ran to
> a parked vehicle at a nearby residence.  Olga
> Perez, the owner of the vehicle, was near
> said vehicle at the time decedent arrived
> there.  Said vehicle was blocked by another
> car in a driveway.  There was no place for
> the vehicle to go.
>
> 10.  Although there was no threat of imminent
> death or serious bodily injury to either the
> defendant officers or third parties at the
> time, CHAVEZ and GRIJALVA shot and killed
> decedent.  At the time of the shooting,
> SANDERS was in proximity and condoned and
> failed to intervene to prevent the
> unnecessary deadly force of the two officers.
> The defendant officers also fabricated a
> false version of the incident to justify the
> unreasonable use of deadly force.  Nor has
> the autopsy report demonstrating the falsity
> of the defendant officers' version been
> disclosed, despite the passage of nearly two
> years.
>
> 11.  SANGER's liability under federal law
> stems from its unconstitutional customs and
> policies, which will be specified at a later
> point in this proceeding, as permitted by
> applicable law.  Plaintiffs [sic] are

2

informed and believe that, through these
unconstitutional customs and policies, SANGER
encouraged both the overt misconduct of the
individual defendant officers, by which the
decedent was victimized, as well as the
substantial acts and omissions of the
defendant officers to conceal their overt
misconduct.

Defendants move for summary judgment on the claims alleged

against them.  At the hearing, Plaintiff conceded summary

judgment in favor of Defendant Sergeant Fred Sanders.

A.  <u>Defendants' Objection to Plaintiff's Evidence and
Request to Strike</u>.

In opposing Defendants' motion for summary judgment,

Plaintiff submitted the Declaration of Ivan Hurd:

1.  In January 2007, I acted as an
investigator for attorney Kevin Little in
interviewing Olga Perez and Robert Perez at
their residence in Sanger, California.

2.  An audio recording of that interview is
Exhibit A to this declaration.  Photographs I
took of the interview subjects and their
residence are Exhibit C to this declaration.
All of these copies are true and correct
versions of the originals.  What follows is
my recollection of said interviews, which
comports with the information cited from the
actual transcripts in the accompanying
memorandum of points and authorities.

3.  Both Mrs. Perez and Mr. Perez indicated
that the two shots fired were not
contemporaneous or in rapid succession.
Instead, there was a lapse of time between
the shots sufficient for Mrs. Perez to reach
a point out of harm's way, outside of the
garage, and for Mr. Perez to get from a
bedroom inside the residence to the area of
the garage door.  The shooting incident
occurred in the Perezes' garage.

4.  Neither Mrs. nor Mr. Perez indicated

3

being at risk of death or imminent bodily harm at the time of the second shot.

5.   Mr. Perez stated he opened the door to his garage mere moments after the second shot and saw an officer on the right side of the garage as he was facing outward, i.e., at the driver's side of the subject vehicle.  This officer was no more than two feet from the decedent when Mr. Perez first observed him, and he still had his firearm drawn and pointed at the decedent.

6.   Mr. Perez stated he first observed the decedent alive and then saw his eyes roll back and his body slump over.

7.   Mr. Perez stated he observed a second officer on the other side of the garage, i.e., the passenger side, to the rear when he first opened the garage door.  Mr. Perez permitted me to photograph him in the position where he first recalled seeing this second officer, and that photograph is included in Exhibit C.

8.   Mrs. Perez stated she did not see, but instead only heard, the first and second shots fired.  Mrs. Perez heard the second shot fired after she had already reached a point of safety outside the garage.  Mrs. Perez permitted me to photograph her at the location she recalls reaching, and that photograph is included in Exhibit C.

9.   The photographs contained in Exhibit C reflect Mr. Perez' observation of the second officer, of the positioning of the subject vehicle and the vehicle immediately behind it during the incident.  These photographs also reflect Mrs. Perez stated positioning outside the garage, where she recalled being at the time the second shot was fired.

10.   Both Mrs. and Mr. Perez recalled that the decedent was unarmed and had no viable means of escape, since there was a pickup truck parked directly behind the subject vehicle and two other cars, belonging to their son and another relative, parked in the vicinity of the driveway at that time.

4

1

2          **11.  If called as a witness, I could truthfully testify as to the foregoing**

3

Attached to Mr. Hurd's declaration is what purports to be a

4

transcript of his interview with Mr. and Mrs. Perez in January

5

2007.  Plaintiff lodged a copy of Mr. Hurd's interview of the

6

Perezes on September 2, 2008 (Doc. 42).  There is no indication

7

who transcribed the interview, there is nothing from which it may

8

be inferred that the Perezes were under oath, and there is no

9

authentication of the purported transcript from the Perezes.

10

     Defendants contend that this evidence is provided in

11

contradiction to a Court Order and the rules of discovery.

12

     By Order filed on October 20, 2007, Defendants' motion to

13

compel discovery responses was granted and monetary sanctions

imposed.  (Doc. 23).  The Order provided:

14

15          **1.  Defendants' Motion to Compel Responses to outstanding discovery is GRANTED and Plaintiffs shall have forty-five (45) days**

16          **from October 12, 2007, to serve verified responses to all current Requests for Admissions, Production Requests and**

17          **Interrogatories served by Defendants.**

18

19          **2.  Both Plaintiffs and Defendants shall have thirty (30) days from October 12, 2007, to serve each other with initial disclosures**

20          **required by *F.R.Civ.P.*, *Rule 26(a)*.**

21          **3.  Plaintiffs' counsel, Kevin G. Little, has represented to the Court that he fully**

22          **understands his obligations to timely respond to all communications and notices from**

23          **Defendants and the Court and that he will do so henceforth.  Mr. Little further**

24          **understands that his failure to do so in the future or his failure to comply with the**

25          **federal rules, this or any Order of this Court may result in sanctions, including, but**

26          **not limited to monetary, exclusionary or**

5

1            terminating.

2            4.   All parties are encouraged to timely
             communicate with each other or directly with
3            the Court if circumstances arise in the
             future which might affect any party's ability
4            to abide by this Order.

5            5.   Defendants' request for monetary
             sanctions in the amount of $1,110.00 as costs
6            for having brought this Motion to Compel is
             deemed reasonable and appropriate.   However,
7            Defendants have offered and the Court agrees
             to stay the imposition of such sanctions
8            until the final disposition of this matter by
             way of settlement, dispositive motion or
9            trial, as deemed appropriate at such time.

10       Defendants refer to their First Set of Interrogatories:

11           INTERROGATORY NO. 14:

12           Please state in complete detail each and
             every fact (including the source of such
13           fact) upon which you base your contention in
             paragraph 10 of your Complaint that there was
14           no threat of imminent death or serious bodily
             injury to either the defendant officers or
15           third parties at the time of this incident.

16           INTERROGATORY NO. 15:

17           Please state in complete detail each and
             every fact (including the source of each such
18           fact) upon which you base your contention in
             paragraph 10 of your Complaint that officers
19           fabricated a false version of the incident.

20           INTERROGATORY NO. 16:

21           Please state in complete detail each and
             every fact (including the source of each such
22           fact) upon which you base your contention in
             paragraph 11 of your Complaint that the City
23           of Sanger had any unconstitutional customs
             and policies at the time of this incident.

24
    Plaintiff's Responses to All Discovery Propounded by Defendants,
25
    signed by Mr. Little on *January 29, 2008*, i.e., well after the
26

                                6

time prescribed in the Order granting the motion to compel, states:[2]

        **FIRST SET OF INTERROGATORIES**
        ...

        **14.  Plaintiffs have received reports from unidentified third parties that the decedent should not have been shot and killed by the officers and the reported version of the incident is intentionally false.  They believe this information is substantiated by the failure of the defendants and the County of Fresno to provide the autopsy report and the odd handling of the public records requests.**

        **15.  Plaintiffs have received reports from unidentified third parties that the decedent should not have been shot and killed by the officers and the reported version of the incident is intentionally false.  They believe this information is substantiated by the failure to the defendants and the County of Fresno to provide the autopsy report and the odd handling of the public records requests.**

        **16.  Plaintiffs have received reports from unidentified third parties that the decedent should not have been shot and killed by the officers and the reported version of the incident is intentionally false.  They believe this information is substantiated by the failure of the defendants and the County of Fresno to provide the autopsy report and the odd handling of their public records requests.  The City of Sanger's role in covering up this incident, specifically, shows ratification of the officers' acts that rises to the level of policy for purposes of**

---

[2]**Mr. Little has an explanation for his failure to timely comply with the Court Order.  He avers that "plaintiff's original discovery was late only because the entire file (as opposed to now a portion of the file) was misplaced during my November 2007 move." He further asserts that the deposition of Sylvia Esquivel did not take place earlier than it did because the defense was late in providing responses to plaintiff's discovery.**

section 1983 and the state civil rights laws
[sic].

Defendants refer to their First Request for Production:

REQUEST FOR PRODUCTION NO. 12:

Please provide any and all documents or other
materials you have to support your allegation
in paragraph 10 of your complaint that
officers purportedly fabricated any version
of this incident.

REQUEST FOR PRODUCTION NO. 13:

Please provide any and all documents or other
materials you have to support your allegation
in paragraph 11 of your complaint that any of
the defendant officers purportedly 'conspired
to hide the truth.'

REQUEST FOR PRODUCTION NO. 14:

Please provide any and all documents or other
materials you have to support your allegation
in paragraph 11 of your complaint that any of
these defendants had 'unconstitutional
customs and policies.'

Plaintiff's Responses to Discovery Propounded by All Defendants
signed by Mr. Little on January 29, 2008, stated in response to
these specific requests for production of documents:

Plaintiffs believe the documents primarily
responsive to this interrogatory are in the
possession of the defendants, their
attorneys, and as yet undisclosed third
parties.  Plaintiffs believe that the
defendants are continuing to conceal the
responsive statements and the autopsy report,
specifically.

Defendants complain that Mr. Hurd's declaration makes clear
that Plaintiff and Plaintiff's counsel, Mr. Little, knew in
January 2007 that the "unidentified third parties" referred to in
their January 29, 2008 discovery responses were Mr. and Mrs.

8

Perez but failed to disclose their identities to Defendants.
Defendants contend that they took the deposition of Sylvia
Esquivel, legal representative of the estate of Decedent, on July
18, 2008, the date of discovery cut-off, and there was no
disclosure of the recorded Perez interviews approximately 18
months previously.  On August 13, 2008, Defendants filed their
motion for summary judgment, relying on the original recorded
interviews of Mr. and Mrs. Perez.  Defendants assert that,
because the originally recorded interviews were supportive of and
consistent with the versions of the reporting officers,
Defendants did not see a need to depose them.  On August 25,
2008, Mr. Little sent an e-mail to Defendants' counsel, Mr.
Praet, in which Mr. Little stated:

> Mr. Praet, please find enclosed a draft
> transcript I have prepared of interviews my
> former investigator, Ivan Hurd, did of Mr.
> and Mrs. Perez, as well as photographs of he
> Perez residence taken by Mr. Hurd.  The
> interview recording and photos were recently
> obtained from Mr. Hurd, whom I learned had
> kept copies of these documents when I
> contacted him about a summary judgment
> opposition declaration.  I had never been
> able to locate my copies of these documents,
> and, indeed, I still cannot.
>
> A copy of the sound recording of these
> interviews will be sent out today.

Defendants complain that Plaintiff's opposition to the motion for
summary judgment relies almost entirely on the previously
undisclosed hearsay interviews of the Perezes by Mr. Hurd.

Defendants contend that, by withholding the recorded
interview of the Perezes for over 18 months "in spite of clearly

delineated Rule 26 obligations and outright false representations

in untimely discovery responses, Plaintiff conveniently allowed

the discovery cut-off date to pass knowing that Defendants would

believe that these two witnesses had provided contemporaneous,

recorded interviews to Sheriff's investigators in 2005."

Defendants complain that Plaintiff's "flagrant violations of the

federal rules and this Court's unequivocal Order have resulted in

extreme prejudice to Defendants."   Defendants argue that

Plaintiff should not be allowed to suggest that Defendants be

permitted to depose the Perezes:

> Plaintiff cannot be permitted to make a
> mockery of this Court's Orders and the
> obligations imposed by the federal rules in
> order to postpone or attempt to defeat a
> summary judgment motion filed by Defendants
> who have consistently followed such Orders
> and rules.  This is especially true when
> Plaintiff and her counsel were previously
> warned that exclusionary and/or termination
> sanctions could result with further
> violations after monetary sanctions had
> already been imposed.

Mr. Little filed a Declaration in response to Defendants'

objection to this evidence and request to strike it.  Mr. Little

avers:

> 2.  The defense neglects to advise the Court
> that the Perezes were listed as defense
> witnesses in the Rule 26 initial disclosures,
> yet the defense apparently never even had
> contacted or spoken with these witnesses.
> There [sic] Perezes were both also included
> in the plaintiff's initial disclosures, which
> incorporated the defense disclosures by
> reference.

> 3.  The defense further neglects to advise
> the Court that it was specifically advised

during discovery, on July 18, 2008, that Olga
and Richard Perez were witnesses on behalf of
the plaintiff.  On that date, the deposition
of plaintiff representative Sylvia Esquivel
was taken, and she informed counsel for the
defendants that the Perezes had reached out
and contacted her because they did not abide
the official account of the shooting
incident.  <u>See</u> Deposition of Sylvia Esquivel,
pp. 36-38.  Defense counsel was also given
details regarding the Perezes' account of the
incident during that same deposition,
including all of the details upon which
plaintiff relies in opposing summary judgment
in this case.  <u>See</u> Deposition of Sylvia
Esquivel, p. 38-41.  Thus, the defense
learned during discovery all of the
information that plaintiff relies upon in
opposing the pending summary judgment motion.
Yet the defense never sought to depose or
statementize the Perezes before going forward
and filing for summary judgment.

In the cited portions of Sylvia Esquivel's deposition, Ms.
Esquivel testified that she had spoken to Olga Perez on the
telephone a couple of days after the incident after Mrs. Perez
had called her:

Q.  And what did she say?

A.  She as a mother just wanted me to know
that, what happened, she didn't know who my
son was but as a mother she just wanted me to
know that there was - she wasn't in any
danger.

Q.  She wasn't in any danger, what do you
mean?

A.  That she wasn't.  She said that she - it
just happened so fast that she really wasn't
in any danger.  In order words, for the
second shot to be fired.

...

Q.  Did she tell you she felt she was in
danger when the first shot was fired?

11

A.   She said that she - when - when she was
knocked down from the vehicle, when it moved
she couldn't remember at that time because it
happened so fast where her feet were or where
she was.   But that's only because she wasn't
even in the car, it's just that when he moved
it, it knocked her down.   And that was where
she was - became afraid but didn't feel that
it was necessary, according to her.

Q.   Was she emotional on the phone?

A.   No.

Q.   But she told you - well, tell me what she
told you happened.

A.   Just basically that she was getting ready
for a funeral.   The car was in the garage,
the garage door was opened.   He - she got out
of the driver's side, was going around to the
passenger side when she saw someone in the
vehicle, meaning my son.   She said she didn't
feel like she was in any danger, she was just
worried and concerned about some tickets that
she had in the car.   So she was not in the
car but she went in to reach for those
tickets and told him please don't take my
car.   But he didn't look at her, he didn't
say anything to her, he was just looking
through the rearview mirror. [¶] And so then
it escalated when the police came so that's
when she tried to get herself out of the car
and she did.   However, when he reversed the
door knocked her down and that's where it all
began.

Q.   You say in your words that it escalated
when the police came; is that something she
said?

A.   She - well, you know what, I don't know
if that was her words or not.

Q.   Okay.   But she said when Stephen put the
car in reverse the door was opened and that's
what knocked her to the ground?

A.   That's correct.

Q.   And that's when the first shot was fired

12

1        or somewhere in there?

2        A.  She said because she was knocked to the
         ground all she could hear was the one shot.
3        She didn't know which side - she knew it had
         to be on the opposite side because there was
4        no one on her side.  And so then when all
         that - when they were making the commands
5        then she stepped - she actually was very
         upset because she's the one that got away
6        from the vehicle.  And when the second shot
         came through she was already at the, you
7        know, outside of her garage, nowhere in
         danger.
8
         Q.  So she told you that she was already up
9        on her feet by the garage when the second
         shot was fired?
10
         A.  That's correct.
11
         Q.  Did she tell you how long it had taken
12       her from the time she had been knocked down
         to the time when the second shot was fired?
13
         A.  She said it happened so fast.
14
         Q.  Is that the only time you've talked to
15       Mrs. Perez?

16       A.  She - there has been two phone calls.
         The first time was what she told me, the
17       second time was just something her husband
         needed to tell me.  So I had a conversation,
18       not a long conversation but a conversation
         with the husband just to tell me that from
19       what he could see they - he thought - what he
         said was maybe I watch too many movies, he
20       says, but he saw him pulled out of the patrol
         car and just dragged on the cement, tore his
21       shirt off, he thought they were going to give
         him CPR but then they just laughed.
22
         Q.  Dragged out of the patrol car?
23
         A.  No, I'm sorry, dragged out of the car.
24
         Q.  And you said the officers dragged him out
25       of the car and removed his shirt?

26       A.  Yes, removed his shirt - well, actually

                              13

1          tore his shirt and laughed.

2          ...

3          Q.  When did he call you?

4          A.  I would say about a week after the first
           initial phone call.
5
           Q.  Did he tell you why he was calling?
6
           A.  Well, actually she called me just to see
7          how I was doing and if, you know, she was
           needed for anything, just that was it
8          basically.

9     Defendants assert that Mr. Little's averments that the

10    Perezes were listed as Plaintiff's witnesses in Plaintiff's Rule

11    26 initial disclosures and that his Rule 26 disclosure

12    obligations were met by incorporating defense disclosures by

13    reference is false and inappropriate.  Defendants contend that,

14    while Olga Perez was listed by Defendants in their initial

15    disclosure, Mr. Perez was not.  Defendants argue:

16          [I]f the federal rules [e.g. *F.R.Civ.P., Rule
           26(a)(1)(A)(i)*] and the rules of this Court
17         are to have any effect, Plaintiffs simply
           cannot be permitted to 'incorporate' one of
18         Defendants' disclosed witnesses (without even
           naming her) and then completely fail to even
19         identify the other witness (i.e. Richard
           Perez).  This would result in nothing less
20         that impermissible trial by ambush and
           completely undermine the general practice of
21         the federal courts to engage in open
           discovery.
22
           Defendants argue that Sylvia Esquivel's deposition
23
      testimony, taken approximately two weeks before the discovery
24
      cut-off, does not excuse Mr. Little's failure to timely disclose
25
      Mr. Hurd's interview of the Perezes or to correct Mr. Little's
26

                                14

discovery responses referring to "unidentified" or "undisclosed"

third parties.   Defendants assert:

> [H]aving had no reason to ever suspect that
> Olga Perez would be persuaded to seemingly
> contradict her contemporaneously recorded
> interview, Defendants moved forward with a
> timely summary judgment motion raising the
> single material issue of the objectively
> reasonable belief of the involved officers.

Mr. Little further avers in his opposition declaration:

> 4.  The defense also learned during that same
> deposition that the Perezes were not
> specifically disclosed as witnesses earlier
> because they themselves did not want to be
> identified.  See Deposition of Sylvia
> Esquivel, p. 50-54.  I was not going to
> override the Perezes wishes and make a
> premature specific disclosure of reluctant
> witnesses with such important information,
> based on my past unfortunate experiences in
> that regard:
>
> a.  An early disclosure of a
> witnesses [sic] Butch Schultz and Cathy
> Williams in a prior case before Your Honor,
> Hurd v. Richardson, No. CV-F-96-6109 OWW DLB,
> resulted in their being harassed to the point
> where Mr. Schultz relapsed into alcoholism
> and died, and Ms. Williams lost her cattle
> ranch and was falsely charged with a felony
> that had to go to trial for her to be
> exonerated.  These incidents were aired in
> the Hurd trial, where a supplemental witness
> tampering complaint was filed, as well as in
> the trial held in the related action,
> Williams v. Richardson, No. CV-F-98-5194 AWI
> DLB.  In both of those cases, juries found
> that Fresno Sheriff's Department officers and
> certain private individuals engaged in a
> witness tampering conspiracy, the targets of
> which were Mr. Schultz and Ms. Williams.  The
> record of those actions also shows that I was
> the target of false charges as part of an
> attempt to get a search warrant for my office
> and retrieve a surreptitious audiotape
> evidencing the witness tampering conspiracy.

b.  The disclosure of Julia and Terry Doan as witnesses in <u>Doan v. Taft Police Officer Sanders</u>, No. CV-F-98-5103 LJO, a case which settled after an appellate reversal of a defense verdict, resulted in their being falsely arrested seven times by the same police agency[.] Mrs. Doan was suing for sexual assault, as well as their being unsuccessfully prosecuted based on each of those arrests in the Taft-Lamont Municipal Court.  Despite the outcome of her case, the stress of this harassment led to the Doans' divorce and Mrs. Doan's lapse into drug abuse.  I was also personally held in contempt, fined, and sentenced to jail for defending the Doans in those criminal cases, a matter which had to be appealed all the way through the state court system and to the Ninth Circuit before being finally resolved in my favor.  <u>See</u> <u>Little v. Kern Superior Court</u>, 294 F.3d 1075 (9th Cir.2002).

c.  In addition to these two most prominent examples, I have had witnesses in my civil cases receive bogus traffic tickets (Diane Meikle in <u>Louen v. Twedt</u>, No. CV-F-04-6556 OWW SMS), frivolously sued in state court (Holly and Michael Louen, again Case No. CV-F-04-6556 OWW SMS), and contacted and harassed by law enforcement officers shortly after filing suit or giving their depositions (Kathryn Hogan [Case No. CV-F-03-6308 LJO GSA], Randy DeShazier [Case No. CV-F-06-0591 AWI SMS], Tommy Jones [Case No. CV-F-00-6328 REC SMS], and Shaun Fanucchi [Case No. CV-S-07-608 FCD GGH]).

d.  All of these experiences have led me to conclude that witnesses against law enforcement in civil rights cases, particularly 'smoking gun' witnesses such as the Perezes are at real risk for retaliatory action.  My experience also has taught me that I myself am at risk of witness tampering allegations, or worse, in these same cases, and the aforementioned episodes have taken a considerable toll on me personally, financially and health-wise.  The court system unfortunately has a very limited ability to take effective preemptive action against law enforcement officers who might

16

engage in such retaliatory conduct, because
their actions are presumed legitimate until
proven otherwise.

e.   Other case specific factors
contributed to the course of action I decided
to take in this instance.  The Perezes
statements to my investigator essentially
make then witnesses to an unlawful killing,
and that information is far more sensitive
than what even Williams, Schultz, or the
Doans possessed.  I am also informed and
believe that the Perezes contacted the Sanger
Police Department in spring 2005 and
attempted to provide them with the same
information provided to plaintiff's
investigator months later.  However, the
information was never memorialized in any
report that has been provided in discovery.
I am also aware that the autopsy report[1] was
withheld from disclosure, despite Ms.
Esquivel's repeated requests and the requests
of her counsel under the California Public
Records Act, for more than two years after
the incident.  I relied on this information
in assessing the risk to the Perezes as a
result, since it showed in my view that
someone associated with the law enforcement
or the defense displayed a willingness to
manipulate and conceal evidence.  Given my
experience, I was not going to take
unnecessary steps that might endanger the
Perezes, who live in Sanger and have a son,
any more than their disclosure as plaintiff's
witnesses minimally required.  Nor was I
going to put myself at any risk
unnecessarily.  I therefore decided to
balance the Perezes and my own safety
concerns against the duty to disclose
witnesses, making the decision to disclose
the Perezes during discovery, but not to
highlight their disclosure unduly or make
their disclosure prematurely.  This is the
only way I saw to comply with my discovery
obligations but not create an unnecessary
risk to the Perezes or myself.

[1]While causation and damages were not issues
raised by the defense motion, it is
uncontested from the belatedly disclosed
autopsy report that only the second shot -

17

1       the one fired when Olga Perez was no longer
     in danger - was the sole fatal shot ...
2       Because the Perezes' testimony will be so
     important in establishing the defendants'
3       liability, causation, and plaintiff's
     damages, the perceived risk to them as a
4       result of their disclosure was even greater.
     In light of the autopsy report, the defense
5       attempt in its reply papers to downplay the
     importance of the sequence of shots and the
6       interval of seconds between the first and
     second shots is patently misleading.

7

    The portion of Sylvia Esquivel's deposition on which Mr.

8

Little relies states as follows:

9

10       Q. ... So in your interrogatory responses
     when you state unidentified third parties
     you're referring to Olga Perez and her
11       husband?

12       A.  Yes.

13       Q.  Have you spoken to anyone else who has
     suggested to you that this shooting should
14       not have occurred?

15       A.  No, I don't recall.

16       Q.  You spoke to Mr. and Mrs. Perez within a
     week or so after the incident, right?
17
     A.  With Mrs. Perez a week after.
18
     Q.  Okay.  And then Mr. Perez?
19
     A.  Was a couple, at least a couple of weeks
20       after that.

21       Q.  Okay.  Is there some reason when you
     responded to these interrogatories that you
22       listed them as unidentified third parties?

23       A.  I guess at the time I didn't know like
     Mr. Perez, I didn't know - I considered him a
24       third party.

25       Q.  Okay.  But you knew his identity, right?

26       ...

1          A.  Yes.

2          Q.  Okay.  Is there any reason you put
           unidentified?
3
           ...
4
           Q.  Okay.  You had a chance to talk to your
5          attorney, do you now know why you put
           unidentified third parties in your
6          interrogatory response?

7          A.  Yes, because at the time they did not
           want to be identified.
8
           Q.  They told you that, the Perez family did?
9
           A.  Yes.  You have to understand it was
10         painful for her as well but she was willing
           to - she was more concerned about me because
11         I wasn't there and that she couldn't give me
           answers.  So she just wanted to, I guess,
12         settle my mind, my thoughts.  It was just a
           compassionate thing.
13
           Q.  Okay.  Did she ever provide you with a
14         written statement or a recorded statement?

15         A.  No.

16     Mr. Little's averment that he was not going to override the

17 Perezes' wishes not only makes Mr. Little a witness but continues

18 to beg the question why sworn affidavits have not been obtained

19 from the Perezes.  Mr. Little's averment that he failed to

20 disclose the Perezes as witnesses in order to uphold their wish

21 not to be identified is belied by Mr. Little's actions.  As

22 Defendants contend:

23         [W]hen Mr. Little conveniently provided the
           Perez interviews (curiously without objection
24         or request for any sort of protective order
           or even a hint of concern) _after_ the
25         discovery cut-off date and _after_ having
           received Defendants' timely summary judgment
26         motion, he offered the following single

excuse for the delay:

> '*I had never been able to locate my
> copies of these documents, and,
> indeed, I still cannot.*' ....

Mr. Little's August 25, 2008 email to Mr. Praet contradicts his

"current excuse of fears of witness tampering and harassment."

that Mr. Little's alleged fears of witness tampering and

harassment is also belied by his averment in Paragraph 4(e) of

his declaration that he is "informed and believe that the Perezes

contacted the Sanger Police Department in spring 2005 and

attempted to provide them with the same information provided to

plaintiff's investigator months later."   Mr. Little's unverified

statement negates his claim that the Perezes harbored any fear of

intimidation, witness tampering or harassment from the Sanger

Police Department.   As Defendants assert:

> On the contrary, they have apparently been
> anxious to hear from the police and the
> pretextual fears exist only in the mind of
> Mr. Little as a sad excuse for his failure to
> timely provide recorded statements he had
> improperly withheld for over 18 months.

Mr. Little's averments that the non-release of the autopsy

report reinforced his concern about witness tampering and

harassment and his own safety is incomprehensible.   Defendants

had no copy of or control over the autopsy report, which was

prepared by the coroner of the County of Fresno.   Defendants

provided the autopsy report to Plaintiff immediately upon receipt

in a Supplemental Rule 26 Disclosure on January 31, 2008.   As

Defendants argue:

Mr. Little cannot be permitted to have his cake and eat it too - i.e. once he received the autopsy report in January 2008, his completely unfounded fear of manipulation and retaliation were dispelled and he no longer had any reason or excuse to improperly withhold the Perez interviews obtained more than a year earlier.

In his opposition declaration to Defendants' request to strike the Hurd Declaration and the transcript of the Perez interviews by Mr. Hurd, Mr. Little maintains:

5.   It is further important to note that, despite the foregoing legitimate concerns, the plaintiff generally identified the Perezes as witnesses in its January 2008 initial disclosures, by incorporating the defense's own initial disclosures by reference.  While the defense also had every opportunity to seeking more witness identification information by propounding interrogatories on this subject, it <u>did not propound a single witness identification interrogatory</u>, not even to follow up on the plaintiff's initial discovery answers identifying undisclosed third parties in response to the defense's various contention interrogatories.  Indeed, the first point during discovery where plaintiff was requested to further identify its witnesses was during the deposition of Sylvia Esquivel, and it did so to defense counsel's apparent satisfaction at that time.

6.   Despite receiving the information it did at Ms. Esquivel's deposition, the defense did not see fit even to propose taking the Perezes' depositions and instead went ahead with filing the pending summary judgment motion in August 2008.  Apparently, the defense also made a strategic choice not to enlist the assistance of an investigator to statementize the Perezes during this same time period as well.  Clearly, the defense has not done everything it could and should have, either as a matter of discovery or investigation, to obtain the witness information it now wrongly contends was

21

withheld.

7.  Despite the defense's belated and unfounded defense accusations, the plaintiff has not in any way manipulated the Perezes. As made clear above, the Perezes initiated contact with the plaintiff, not vice versa. Also, the plaintiff obtained statements from the Perezes in January 2006, nearly two years before the defense provided the statements it claims plaintiff's counsel manipulated the Perezes into contradicting.  Moreover, it is clear from the provided interview transcripts that both Olga and Richard Perez were permitted at the outset of their interviews to provide their accounts of the incident virtually without interruption, only thereafter to be questioned regarding the information they provided.  The plaintiff's investigator also questioned the Perezes far more extensively and carefully than did the internal affairs investigator from the Fresno Sheriff's Department, leaving little doubt as to what their actual accounts of the incident are.  Any objective comparison of the interviews performed by plaintiff's investigator with that of the Fresno County Sheriff's Department internal affairs investigator shows the former to be much less leading and much more detailed.

8.  Further, while the defense points to snippets of the Fresno Sheriff's Department interviews of the Perezes, particularly a small portion of Olga Perez' internal affairs interview, the totality of that interview shows her internal affairs statement was neither as clear nor as contradictory as the defense now claims.  As an example, even after making the statement relied upon by the defense, Ms. Perez stated that 'once when he [one of the officers] fired; then the car stopped,' and she was able to 'go crawling and then actually get up.'  After making this statement, Mrs. Perez was asked, on page 10 of her interview transcript, 'So you left, you crawled out of the area after the shots went off?'  Mrs. Perez response, if there was any, is not audible on the actual recording of her interview, which the defense has not provided to the Court.

22

9.  I have listened to the full recording of Mrs. Perez internal affairs statement, and it shows someone who is still under the emotional effects of a traumatic incident, and interview statements which in writing might seem to reflect clear, sequential thoughts are revealed to be far less so on the actual audio recording, again which the defense did not see fit to provide.  (I am lodging a recording in connection with my present declaration.)  For example, at another point during her internal affairs interview, on page 6 of her statement, Mrs. Perez states that she was on the floor when she heard the <u>first</u> shot.  Mrs. Perez also told the internal affairs investigator on page 11 that she knew the decedent was shot one time while she was on the ground.  These portions of Mrs. Perez' interview are corroborated by Mr. Perez' internal affairs interview, where he states that he believes he saw the second shot, at which time his wife was not in the vicinity of the subject vehicle but outside the garage.  <u>See</u> Transcript of Mr. Perez' IA interview, pp. 2-3.

Mr. Little's references to the transcripts of Mr. and Mrs. Perezes Fresno County Sheriff's Department Internal Affairs interviews are in response to copies of those interviews attached to Defendants' reply brief in support of the motion for summary judgment.  This aspect of Mr. Little's declaration is an improper sur-reply brief.

The Court has reviewed the copies of the transcripts of Fresno County Internal Affairs interviews of the Perezes on November 29, 2005 and a copy of the transcript purporting to be Mr. Hurd's interview of the Perezes in January 2007.  The only critical differences between the two is that Mrs. Perez stated in the Internal Affairs interview that she thought Esquivel was

going to run over her after she was knocked down by the car and that, when she heard the second shot, "that's when I started crawling and I went to the other side of the, of the garage", that "for the first one was when I was on the ground and then I heard the second one ... [a]nd then that's when you know I started, I was crawling out of there," and that she was afraid that the car was going run over her after she fell.

Defendants object to Mr. Hurd's Declaration and the purported transcript of Mr. Hurd's interview of the Perezes on the ground that this evidence is inadmissible hearsay. Defendants contend that, while Plaintiff had every opportunity during discovery to properly obtain affidavits from Olga and Richard Perez as permitted by Rule 56(f), "no such effort was made and there has been zero showing as to why such affidavits could not have been obtained as otherwise required by Rule 56(e)(2).

Mr. Little responds that he "saw fit to present the authenticated transcript and recording of the Perezes' interviews, as well as the photographs documenting their statements, because it is well established that Rule 56 does not require a party to submit material evidence 'in a form that would be admissible at trial in order to avoid summary judgment.    Mr. Little asserts that he has demonstrated that the Perezes could testify at trial, and Mr. Hurd's transcript and recording could also be admissible at trial pursuant to Federal Rule of Evidence

1  801(d)(1)(B) as a prior consistent statement.[3]  Mr. Little avers:

2          There was nothing insidious or misleading
           about counsel's election; to the contrary,
3          counsel saw fit to present a recording in
           part to ensure the genuineness of the
4          evidence proffered.  If plaintiff's
           investigator had not fortunately retained his
5          copy of the interview recording, then I
           certainly then could and would have obtained
6          declarations from the Perezes.

7          After oral argument and without first obtaining leave of

8  court, Mr. Little filed a "List of Authorities Referred to During

9  Oral Argument."  (Doc. 57).   Mr. Little asserts that "[t]his

10 issue was first broached by the Court's questioning, and counsel

11 did not have specific authorities available to substantiate his

12 assertion that FRCP 56(e) permits certain unsworn evidence to be

13 considered in connection with a summary judgment motion."

14         Defendants object to Mr. Little's List of Authorities as

15 untimely and improper.  Defendants correctly note that the Court

16 took the motion under submission at the conclusion of the hearing

17 and required Defendants to choose between deposing the Perezes or

18 submitting the motion without further input.

19         The Court agrees with Defendants and will not consider Mr.

20

21         [3]Rule 801(d)(1)(B), Federal Rules of Evidence, provides:

22         A statement is not hearsay if -

23         (1) The declarant testifies at the trial or
           hearing and is subject to cross-examination
24         concerning the statement, and the statement is
           ... (B)) consistent with the declarant's
25         testimony and is offered to rebut an express
           or implied charge against the declarant of
26         recent fabrication or improper influence or
           motive ....

                              25

Little's untimely List of Authorities.

Mr. Little has acted unilaterally in effect by taking the law into his own hands to decide when and under what conditions he will provide discovery and disclose witnesses. His various excuses and especially his excuse for failing to identify the Perezes in the discovery responses are unpersuasive to justify his failure to forthrightly respond to a legitimate defense discovery request. Mr. Little misrepresented to defense counsel in the discovery responses when he spoke of "unidentified" or "undisclosed" third parties, creating impression that Mr. Little did not know who they were. His averments concerning fears of witness tampering and harassment and for his own safety appear overstated and, as Defendants contend, self-created. Mr. Little presents no evidence whatsoever of any bona fide risks to witnesses in this action and, as Defendants note, these alleged concerns are largely negated by his own declaration. To carry Mr. Little's position to its logical end, he will never be required to disclose witnesses in a civil rights action until trial because of his concerns about witness tampering and risks in other cases not involving these defendants. If Mr. Little had valid concerns about the safety of the Perezes, he should have moved for a protective order. Mr. Little's unilateral actions Mr. Little have created the potential for "trial by ambush."

Ms. Esquivel's deposition suggests that Mrs. Perez may have changed her statements from those she gave during the Internal Affairs investigation. Arguably, Defendants should have been

more alert and they offer no explanation why they did not depose

or interview the Perezes before discovery cut-off on July 30,

2008 or seek an extension of the discovery cut-off date.  At the

hearing Defendants rejected the opportunity to depose the

Perezes.

With regard to Mr. Little's contention that Mr. Hurd's

declaration, the purported transcript and the audio recording are

considerable in opposition to the motion for summary judgment

notwithstanding that they are hearsay, Rule 56(e)(2) provides:

> When a motion for summary judgment is
> properly made and supported, an opposing
> party may not rely merely on allegations or
> denials in its own pleading; rather, its
> response must - by affidavits or as otherwise
> provided in this rule - set out specific
> facts showing a genuine issue for trial.  If
> the opposing party does not so respond,
> summary judgment should, if appropriate, be
> entered against that party.

In *Orr v. Bank of America,* 285 F.3d 764, 773-774 (9th Cir.2002),

the Ninth Circuit held:

> A trial court can only consider admissible
> evidence in ruling on a motion for summary
> judgment ... Authentication is a 'condition
> precedent to admissibility,' and this
> condition is satisfied by 'evidence
> sufficient to support a finding that the
> matter in question is what its proponent
> claims.' ... We have repeatedly held that
> unauthenticated documents cannot be
> considered in a motion for summary judgment.
>
> In a summary judgment motion, documents
> authenticated through personal knowledge must
> be 'attached to an affidavit that meets the
> requirements of [Fed.R.Civ.P.] 56(e) and the
> affiant must be a person through whom the
> exhibits could be admitted into evidence ...
> However, a proper foundation need not be

27

1
                     **established through personal knowledge but**
                     **can rest on any manner permitted by Federal**
2
                     **Rule of Evidence 901(b) or 902.**

3
    **Here, Mr. Hurd's declaration avers that he conducted the**

4
**interview of Mr. and Mrs. Perez and that the copy of the**

5
**transcript of that interview is a true and correct version of the**

6
**original.  Mr. Hurd makes the same averment with regard to the**

7
**photographs taken by him at the time of the interview.  Although**

8
**Mr. Hurd cannot testify at trial as to what Mr. and Mrs. Perez**

9
**told him absent an exception to the hearsay rule, Mr. Hurd's**

10
**declaration satisfies the Ninth Circuit's requirements because**

11
**Mr. Hurd has personal knowledge of what was said at the**

12
**interview.  Mr. Little should have provided declarations from Mr.**

13
**and Mrs. Perez to oppose the motion for summary judgment and his**

14
**excuses for the failure to do so are baseless.  Nonetheless, Mr.**

15
**Hurd's declaration is sufficient to support admission of the**

16
**transcript of the Perezes' interview by him and the photographs**

17
**for the purpose of opposing summary judgment.**

18
    **Defendants' request to strike Mr. Hurd's declaration and**

19
**attached exhibits is DENIED.**[4]

20
    **B.   <u>Governing Standards</u>.**

21
    **Summary judgment is proper when it is shown that there**

22
**exists "no genuine issue as to any material fact and that the**

23

24
    [4]**By this ruling the Court does not condone Mr. Little's actions and inactions in this litigation.  Mr. Little must comply**
25
**with the rules of procedure, including those concerning discovery, and Court orders.  Any future failure to do so will result in the**
26
**imposition of sanctions, which may include monetary or terminating sanctions.**

moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56.  A fact is "material" if it is relevant to an element of a claim or a defense, the existence of which may affect the outcome of the suit.  *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987).  Materiality is determined by the substantive law governing a claim or a defense.  *Id*.  The evidence and all inferences drawn from it must be construed in the light most favorable to the nonmoving party.  *Id*.

The initial burden in a motion for summary judgment is on the moving party.  The moving party satisfies this initial burden by identifying the parts of the materials on file it believes demonstrate an "absence of evidence to support the non-moving party's case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  The burden then shifts to the nonmoving party to defeat summary judgment.  *T.W. Elec.*, 809 F.2d at 630.  The nonmoving party "may not rely on the mere allegations in the pleadings in order to preclude summary judgment," but must set forth by affidavit or other appropriate evidence "specific facts showing there is a genuine issue for trial."  *Id*.  The nonmoving party may not simply state that it will discredit the moving party's evidence at trial; it must produce at least some "significant probative evidence tending to support the complaint."  *Id*.  The question to be resolved is not whether the "evidence unmistakably favors one side or the other, but whether a fair-minded jury could return a verdict for the plaintiff on the evidence

presented." *United States ex rel. Anderson v. N. Telecom, Inc.*, 52 F.3d 810, 815 (9th Cir.1995). This requires more than the "mere existence of a scintilla of evidence in support of the plaintiff's position"; there must be "evidence on which the jury could reasonably find for the plaintiff." *Id.* The more implausible the claim or defense asserted by the nonmoving party, the more persuasive its evidence must be to avoid summary judgment." *Id.* In *Scott v. Harris*, ___ U.S. ___, 127 S.Ct. 1769, 1776 (2007), the Supreme Court held:

> When opposing parties tell different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

As explained in *Nissan Fire & Marine Ins. Co. v. Fritz Companies*, 210 F.3d 1099 (9th Cir.2000):

> The vocabulary used for discussing summary judgments is somewhat abstract. Because either a plaintiff or a defendant can move for summary judgment, we customarily refer to the moving and nonmoving party rather than to plaintiff and defendant. Further, because either plaintiff or defendant can have the ultimate burden of persuasion at trial, we refer to the party with and without the ultimate burden of persuasion at trial rather than to plaintiff and defendant. Finally, we distinguish among the initial burden of production and two kinds of ultimate burdens of persuasion: The initial burden of production refers to the burden of producing evidence, or showing the absence of evidence, on the motion for summary judgment; the ultimate burden of persuasion can refer either to the burden of persuasion on the motion or to the burden of persuasion at trial.

A moving party without the ultimate burden of persuasion at trial - usually, but not always, a defendant - has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment ... In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial ... In order to carry its ultimate burden of persuasion on the motion, the moving party must persuade the court that there is no genuine issue of material fact ....

If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial ... In such a case, the nonmoving party may defeat the motion for summary judgment without producing anything ... If, however, a moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense ... If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment ... But if the nonmoving party produces enough evidence to create a genuine issue of material fact, the nonmoving party defeats the motion.

210 F.3d at 1102-1103.

    C.   <u>Defendants' Statement of Undisputed Facts</u>.

    <u>DUF 1</u>:  On January 29, 2005, Magdalena Granados twice called Sanger 911 to report that Stephen Esquivel (decedent) was abusing her.

        *Defendants's Supporting Evidence*:  Paragraph 8 of Complaint.

31

*Plaintiff's Response*:  Plaintiff disputes the materiality of this asserted fact, since it makes the use of deadly force on the decedent no more or less justifiable. Plaintiff also disputes the accuracy of this asserted fact since the cited portion of the Complaint reads as follows: "Decedent and Granados went to a Shell station in Sanger, California. An argument ensued between decedent and Granados. Granados called 911 twice, hanging up the first time and then falsely reporting that decedent was abusing her." Complaint ¶ 8.

*Ruling*: This fact is material.  The events leading to the deadly force incident are important and Plaintiff included this background in the Complaint.  Plaintiff presents no evidence that Granados' 911 report was false and, even if it was, there is no evidence that the responding officers were aware that the 911 report was false.  DUF 1 is UNDISPUTED.

<u>DUF 2</u>:  Ms. Granados informed Officer Chavez that Esquivel was refusing to return her vehicle.

*Defendants' Supporting Evidence*:  Chavez Declaration.

*Plaintiff's Response*:  Plaintiff disputes the materiality of this asserted fact, since it makes the use of deadly force on the decedent no more or less justifiable. Plaintiff does not dispute its accuracy for purposes of this motion.

*Ruling*: This fact is material because provides background to the events leading to the use of deadly force incident.  DUF 2 is UNDISPUTED.

32

1  **<u>DUF 3</u>:  Esquivel appeared nervous and ran from Officer**
2  **Chavez while the vehicle license was being checked.**

3  ***Defendants' Supporting Evidence*:  Chavez Declaration.**

4  ***Plaintiff's Response*:  Plaintiff disputes the**
5  **materiality of this asserted fact, since it makes the use of**
6  **deadly force on the decedent no more or less justifiable.**
7  **Plaintiff does not dispute its accuracy for purposes of this**
8  **motion.**

9  ***Ruling*: This fact is material because it places the**
10 **deadly force incident in context.   DUF 3 is UNDISPUTED.**

11 **<u>DUF 4</u>:  Officer Grijalva recognized the vehicle license as**
12 **having been previously pursued no less than twice by Fresno PD.**

13 ***Defendants' Supporting Evidence*:  Declaration of**
14 **Grijalva.**

15 ***Plaintiff's Response*:  Plaintiff disputes the**
16 **materiality of this asserted fact, since it makes the use of**
17 **deadly force on the decedent no more or less justifiable.**
18 **Plaintiff does not dispute its accuracy for purposes of this**
19 **motion.**

20 ***Ruling*: This fact is material because it places the**
21 **deadly force incident in context.  DUF 5 is UNDISPUTED.**

22 **<u>DUF 5</u>:  Esquivel entered the driver's door of a vehicle**
23 **parked in a driveway in the 1600 block of James Street with its**
24 **engine running.**

25 ***Defendants' Supporting Evidence*:  Declaration of**
26 **Chavez.**

1       *Plaintiff's Response*: UNDISPUTED.

2           <u>DUF 6</u>:  Despite multiple orders from two uniformed police

3   officers to stop and hysterical pleas from the vehicle owner,

4   Esquivel continued to accelerate back and forth in the vehicle.

5           *Defendants' Supporting Evidence*:  Declarations of

6   Chavez and Grijalva.

7           *Plaintiff's Response*:  Disputed. Plaintiff contends

8   this asserted fact is false, incomplete and misleading.

9   According to Ms. Perez, she was not in fear from Mr. Esquivel's

10  activities, but instead became fearful when she saw one of the

11  officer's weapons drawn. See Declaration of Ivan Hurd, ¶¶ 3-8,

12  10; Exhibit B to Ivan Hurd Declaration, Mrs. Perez' Interview

13  Statement, pp. 6-7, 8, 10, 11. Mrs. Perez stumbled and fell

14  inside the garage as she was then trying to get out of harm's

15  way. See Declaration of Ivan Hurd, ¶¶ 3-8, 10; Exhibit B to Ivan

16  Hurd Declaration, Mrs. Perez' Interview Statement, pp. 7-8, 11.

17  Mrs. Perez was on the floor of the garage near the vehicle when

18  she heard the first shot, but she was "safe," i.e., concealed

19  outside of the garage at the time the second shot was fired. See

20  Declaration of Ivan Hurd, ¶¶ 3-8, 10; Exhibit B to Ivan Hurd

21  Declaration, Mrs. Perez' Interview Statement, pp. 2, 8, 10, 11.

22  She was not in danger at that time from the decedent. See

23  Declaration of Ivan Hurd, ¶¶ 3-8, 10; Exhibit B to Ivan Hurd

24  Declaration, Mrs. Perez' Interview Statement, pp. 8, 10.

25  Moreover, there was a vehicle, Mr. Perez' pickup truck, directly

26  behind the car the decedent was in, as well as two other

relatives' cars in the vicinity of the Perez house, so there was
no escape route for the decedent. See Declaration of Ivan Hurd,
¶¶ 3-8, 10; Exhibit B to Ivan Hurd Declaration, Mrs. Perez'
interview Statement, pp. 10-11. Mrs. Perez does not recall any
repeated acceleration of the vehicle back and forth; instead, she
recalls that the decedent put the subject vehicle in gear when an
officer pointed the gun at him and that the vehicle rolled back
once, causing her to fall to the cement, and struck some
lawnmowers and the pickup truck parked behind it. See Declaration
of Ivan Hurd, ¶¶ 3-8, 10; Exhibit B to Ivan Hurd Declaration,
Mrs. Perez' Interview Statement, pp. 6-7, 10. Mr. Perez also
confirms that his wife was not in the vicinity of the vehicle
when he opened the garage door just about the time the second
shot was fired. See Declaration of Ivan Hurd, ¶¶ 3-8, 10; Exhibit
B to Ivan Hurd Declaration, Mr. Perez' Interview Statement, pp.
13-14, 15, 16. When he first opened the garage door, Mr. Perez
saw an officer on the driver's side of the vehicle, the position
claimed by Officer Chavez in the Sanger reports (see Exhibit D,
Sanger Police Report No. 05-0301, p. 0004), with his gun
drawn at most two feet from the decedent, who at that time was
beginning to slump over and expire. See Declaration of Ivan Hurd,
¶¶ 3-8, 10; Exhibit B to Ivan Hurd Declaration, Mr. Perez'
interview Statement, pp. 14-15, 16-17. Mr. Perez saw another
officer to the rear of the vehicle on the passenger side. See
Declaration of Ivan Hurd, ¶¶ 3-8, 10; Exhibit B to Ivan Hurd
Declaration, Mr. Perez' interview Statement, pp. 14-15. No one

35

appeared to be in imminent danger of death or bodily harm
from the decedent at that time. See Declaration of Ivan Hurd, ¶¶
3-8, 10; Exhibit B to Ivan Hurd Declaration, Mr. Perez'
Interview Statement, pp. 18-19. Mr. Perez remembers repeatedly
asking where his wife was upon arriving at the scene, so he
clearly recalls that she was not in the vicinity of the
vehicle. See Declaration of Ivan Hurd, ¶¶ 3-8, 10; Exhibit B to
Ivan Hurd Declaration, Mr. Perez' Interview Statement, pp. 15-16.
No efforts were being made to extricate or render first aid to
the decedent immediately after the shooting; those efforts did
not begin until after Mr. Perez was permitted to go to
his wife's location outside the garage, at least a minute or so
later. See Declaration of Ivan Hurd, ¶¶ 3-8, 10; Exhibit B to
Ivan Hurd Declaration, Mr. Perez' Interview Statement,
pp. 18-19, 20-21.  The Perezes' accounts of the incident are
detailed in the declaration of Investigator Ivan Hurd, as well as
Exhibits A-C thereto, the audio recording and transcript of said
interviews, and photographs documenting crucial aspects of the
Perezes' interview statements. Officer Chavez' report is part of
the complete Sanger Police Report attached as Exhibit D.

      *Defendant's Reply*: There is zero evidence to dispute
DUF 6.

      *Ruling*:  While most of Plaintiff's response to DUF 6 is
irrelevant to the stated fact, Plaintiff does point to Mrs.
Perez's statement in the interview with Mr. Hurd that she does
not recall any repeated acceleration of the vehicle back and

forth; instead, she recalls that the decedent put the subject
vehicle in gear when an officer pointed the gun at him and that
the vehicle rolled back once, causing her to fall to the cement,
and struck some lawnmowers and the pickup truck parked behind it.
To this extent, DUF 6 is DISPUTED.

DUF 7:  Esquivel struck both a parked pickup truck and
Officer Grijalva with the vehicle he was attempting to steal.

*Defendants' Supporting Evidence*:  Declarations of
Chavez and Grijalva.

*Plaintiff's Response*: Plaintiff disputes DUF 7 on the
identical grounds stated in response to DUF 6.

*Ruling*:  Nothing in Plaintiff's response contradicts or
disputes DUF 7 as to Officer Grijalva.  DUF 7 is UNDISPUTED.

DUF 8:  Both Officers Chavez and Grijalva observed a woman
(owner of the car) with the lower half of her body under the
car Esquivel was accelerating.

*Defendants' Supporting Evidence*:  Declarations of
Chavez and Grijalva.

*Plaintiff's Response*: Plaintiff disputes DUF 8 on the
identical grounds stated in response to DUF 6.

*Defendant's Reply*: Nothing in Plaintiff's response
actually disputes that the officers saw Mrs. Perez with the lower
half of her body under the car Esquivel was accelerating and
point to her interview statement as per Mr. Hurd's audio tape
that "I was being dragged with the car as I hit the ground,
that's when I heard the first shot."

1      *Ruling:*  While most of Plaintiff's response to DUF 6 is

2   irrelevant to the stated fact, Plaintiff does point to Mrs.

3   Perez's statement in the interview with Mr. Hurd that she does

4   not recall any repeated acceleration of the vehicle back and

5   forth.  To this extent, DUF 6 is DISPUTED.

6      DUF 9:  Esquivel continued to ignore orders of officers,

7   Officer Chavez smashing the car window and the guns of both

8   officers pointed at him.

9      *Defendants' Supporting Evidence:*  Declarations of

10   Chavez and Grijalva.

11      *Plaintiff's Response:*  Plaintiff disputes DUF 8 on the

12   identical grounds stated in response to DUF 6.

13      *Ruling:*  Nothing in Plaintiff's response disputes DUF

14   9.  DUF 9 is UNDISPUTED.

15      DUF 10:  When both Officers Chavez and Grijalva perceived

16   that Esquivel would run over the woman under the vehicle,

17   they each independently, but almost simultaneously fired a single

18   shot from their guns.

19      *Defendants' Supporting Evidence:*  Declarations of

20   Chavez and Grijalva.

21      *Plaintiff's Response:*  Plaintiff disputes DUF 8 on the

22   identical grounds stated in response to DUF 6.

23      *Defendant's Reply:*  Plaintiff has at most suggested that

24   the perceptions of Mr. and Mrs. Perez is now that Mrs. Perez had

25   somehow crawled out from under the car "seven seconds" before the

26   second shot.  Defendants assert that "[a]s mildly interesting and

certainly questionable as this changed perception might be, it is not the perception of the Perezes, but the objective beliefs of the officers in split second, tense and rapidly developing circumstances which is solely material to this motion."

*Ruling*:  Defendants' reply is argument.  For whatever reason and contrary to their statements to the Fresno County Internal Affairs officers on the date of the shooting, the Perezes now testify that Mrs. Perez was away from the car not in danger and in the garage when the second shot was fired approximately seven seconds after the first shot.  DUF 10 is DISPUTED.

**DUF 11**:  The vehicle stopped immediately after officers fired and the woman escaped with only minor injuries.

*Defendants' Supporting Evidence*:  Declarations of Chavez and Grijalva.

*Plaintiff's Response*:  Plaintiff disputes DUF 8 on the identical grounds stated in response to DUF 6.

*Ruling*:  Nothing in Plaintiff's response actually contradicts DUF 11.  DUF 11 is UNDISPUTED.[5]

D.  **Excessive Force/Qualified Immunity**.

All claims of excessive force are analyzed under the objective reasonableness standard of the Fourth Amendment set

---

[5]At the hearing, Plaintiff conceded summary judgment in favor of Defendant Sergeant Sanders.  Both Sergeant Sanders' own report of the incident and a videotape of the incident provided to Plaintiff in discovery establish that Sergeant Sanders was still in his police car when the shooting occurred and not in a position to shoot or to prevent the shooting.

forth in *Graham v. Connor*, 490 U.S. 386 (1989) and *Tennessee v. Garner*, 471 U.S. 1 (1985). "Determining whether the force used to effectuate a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S at 396. This balancing test entails consideration of the totality of the facts and circumstances in the particular case, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*. The most important of these factors is the threat posed by the suspect. *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005). In *Garner*, the Supreme Court explained that, while it is unreasonable to apprehend an unarmed, nondangerous suspect by killing him, "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officers or to others, it is not constitutionally unreasonable to prevent escape by using deadly force [and] if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and, if, where feasible, some warning has been given." *Garner*, 471 U.S. at 11-12.

1    In *Price v. Sery,* 513 F.3d 962 (9ᵗʰ Cir.2008), the Ninth

2  Circuit, citing *Scott v. Harris*, ___ U.S. ___, 127 S.Ct. 1769

3  (2007), held:

4           [W]hat an officer has probable cause to
            believe dictates the level of force he may
5           justifiably use in a given scenario.  In
            other words a law enforcement officer's use
6           of force will be justified, or not, by what
            the officer reasonably believed about the
7           circumstances confronting him.  The Supreme
            Court very recently confirmed and clarified
8           this analysis of the relationship between
            *Garner, Graham*, and the Fourth Amendment's
9           reasonableness requirement in *Scott v. Harris*
            ... In considering the reasonableness of a
10          police officer's use of likely deadly force
            to end a high-speed car chase, the Court
11          noted that '*Graham did not establish a
            magical on/off switch that triggers rigid
12          preconditions whenever an officer's actions
            constitute 'deadly force.'  Garner was simply
13          an application of the Fourth Amendment's
            'reasonableness' test to the use of a
14          particular force in a particular type of
            situation.' Id.* at 1777 ... The Court went
15          on to state that '[w]hether or not [the
            police officer's] actions constituted
16          application of "deadly force," *all that
            matters is whether [the officer's] actions
17          were reasonable.' Id.* at 1778 ....

18  In *Harris v. Roderick*, 126 F.3d 1189, 1201 (9ᵗʰ Cir.1997), *cert.*

19  *denied*, 522 U.S. 1115 (1998), the Ninth Circuit held:

20          Certain principles are clearly established
            under the cases described above and others
21          that implement the fundamental rules
            regarding the use of deadly force.  Law
22          enforcement officers may not shoot to kill
            unless, at a minimum, the suspect presents an
23          immediate threat to the officer or others, or
            is fleeing and his escape will result in a
24          serious threat of injury to persons ...
            Moreover, whenever practicable, a warning
25          must be given before deadly force is
            employed.

26

41

The "broad discretion that must be afforded to police officers who face a tense situation," must be extended to mistakes of fact concerning "the existence of probable cause" as well as to mistakes as to what the law requires under particular circumstances.  *Jeffers v. Gomez*, 267 F.3d 895, 909 (9th Cir. 2001).  "The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Graham,* 490 U.S. at 396.  The "question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  *Id*. at 397.    The Ninth Circuit has admonished courts to use caution in cases involving the use of deadly force:

> Deadly force cases pose a particularly difficult problem under this regime because the officer defendant is often the only surviving eyewitness.  Therefore, the judge must ensure that the officer is not taking advantage of the fact that the witness most likely to contradict his story - the person shot dead - is unable to testify.  The judge must carefully examine all the evidence in the record, such as medical reports, contemporaneous statements by the officer and the available physical evidence, as well as any expert testimony proffered by the plaintiff, to determine whether the officer's story is internally consistent and consistent with other known facts. In other words, the court may not simply accept what may be a self-serving account by the police officer. It must also look at the circumstantial evidence that, if believed, would tend to discredit the police officer's story, and consider whether this evidence could convince a rational fact-finder that the officer acted unreasonably.

*Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994).

Qualified immunity serves to shield government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The Supreme Court has set forth a two-pronged inquiry to resolve all qualified immunity claims. First, "taken in the light most favorable to the party asserting the injury, do the facts alleged show the officers' conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If the court determines that the conduct did not violate a constitutional right, the inquiry is over and the officer is entitled to qualified immunity. However, if the court determines that the conduct did violate a constitutional right, *Saucier*'s second prong requires the court to determine whether, at the time of the violation, the constitutional right was "clearly established." *Id*. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id*. at 202. This inquiry is wholly objective and is undertaken in light of the specific factual circumstances of the case. *Id*. at 201. Even if the violated right is clearly established, *Saucier* recognized that, in certain situations, it may be difficult for a police officer to determine how to apply the relevant legal doctrine to the particular circumstances he faces. If an officer

makes a mistake in applying the relevant legal doctrine, he is
not precluded from claiming qualified immunity so long as the
mistake is reasonable.  If "the officer's mistake as to what the
law requires is reasonable, ... the officer is entitled to the
immunity defense."  *Id*. at 205.  In *Brosseau v. Haugan*, 543 U.S.
194 (2004), the Supreme Court reiterated:

> Qualified immunity shields an officer from
> suit when she makes a decision that, even if
> constitutionally deficient, reasonably
> misapprehends the law governing the
> circumstances she confronted.  *Saucier v.
> Katz*, 533 U.S., at 206 (qualified immunity
> operates 'to protect officers from the
> sometimes "hazy border between excessive and
> acceptable force"').  Because the focus is on
> whether the officer had fair notice that her
> conduct was unlawful, reasonableness is
> judged against the backdrop of the law at the
> time of the conduct.  If the law at that time
> did not clearly establish that the officer's
> conduct would violate the Constitution, the
> officer should not be subject to liability
> or, indeed, even the burdens of litigation.
>
> It is important to emphasize that this
> inquiry 'must be undertaken in light of the
> specific context of the case, not as a broad
> general proposition.'  *Id*., at 201.  As we
> previously said in this very context:
>
>> '[T]here is no doubt that *Graham v.
>> Connor, supra*, clearly establishes
>> the general proposition that use of
>> force is contrary to the Fourth
>> Amendment if it is excessive under
>> objective standards of
>> reasonableness.  Yet, that is not
>> enough.  Rather, we emphasized in
>> *Anderson* [*v. Creighton*] "that the
>> right the official is alleged to
>> have violated must have been
>> 'clearly established' in a more
>> particularized, and hence more
>> relevant, sense: The contours of
>> the right must be sufficiently

44

clear that a reasonable officer
would understand that what he is
doing violates that right.' ...
The relevant, dispositive inquiry
in determining whether a right is
clearly established is whether it
would be clear to a reasonable
officer that his conduct was
unlawful in the situation he
confronted.'  ...

The Court of Appeals acknowledged this
statement of law, but then proceeded to find
fair warning in the general tests set out in
*Graham* and *Garner* ... In so doing, it was
mistaken.  *Graham* and *Garner,* following the
lead of the Fourth Amendment's text, are cast
at a high level of generality.  See *Graham v.
Connor*, *supra*, at 396 ('"[T]he test of
reasonableness under the Fourth Amendment is
not capable of precise definition or
mechanical application"').  Of course, in an
obvious case, these standards can 'clearly
establish' the answer, even without a body of
relevant case law.'

543 U.S. at 198-199.  However, as explained in *Wilkins v. City of

Oakland*, 350 F.3d 949, 956 (9th Cir.2003), *cert. denied sub nom.

Scarrot v. Wilkins*, 543 U.S. 811 (2004):

Where the officers' entitlement to qualified
immunity depends on the resolution of
disputed issues of fact in their favor, and
against the non-moving party, summary
judgment is not appropriate.  *See Saucier*,
533 U.S. at 216 ... (Ginsberg, J.,
concurring)('Of course, if an excessive force
claim turns on which of two conflicting
stories best captures what happened on the
street, *Graham* will not permit summary
judgment in favor of the defendant
official.').

Defendants argue that consideration of the totality of the

circumstances, including the four factors identified in *Graham v.

Connor*, *supra*, establish that the officers did not use deadly

45

force in violation of Decedent's Fourth Amendment rights.

        1.  <u>Severity of the Crime(s) At Issue</u>.

     Defendants refer to evidence that the original 911 calls provided the responding officers with a belief that Granados was being abused by Esquivel and that, when Officer Chavez began his investigation, Granados told him that Esquivel refused to give her back her car.  Esquivel fled the gas station while the vehicle license was being checked and Officer Grijalva recognized the vehicle license to a vehicle which had been pursued twice by the Fresno Police Department.  Esquivel then attempted to carjack the Perezes' car and accelerated the car so as to strike both Mrs. Perez and Officer Grijalva with the passenger door, knocking Mrs. Perez to the ground with part of her body underneath the vehicle.  Defendants refer to evidence that Esquivel continued to accelerate the car in reverse even though Mrs. Perez was still on the ground partially underneath the vehicle.

     The evidence is disputed whether Esquivel was *accelerating* the car in reverse.  There is no dispute, however, that Esquivel was attempting to steal the Perezes' vehicle in order to continue his flight from the officers and that the reversing of the vehicle struck Officer Grijalva and knocked Mrs. Perez partially underneath the car.

        2.  <u>Immediate Threat to Safety of Officers and Others</u>.

     Defendants refer to evidence that Esquivel, in attempting to steal Mrs. Perez' vehicle, knocked down Mrs. Perez and hit Officer Grijalva with the car door and, ignoring repeated

commands of the police officers to stop, continued to reverse the car into the parked truck behind it even though Mrs. Perez was partially underneath the car.  Defendants contend that this evidence establishes that Esquivel "had zero regard for the safety of others and that his desperation to escape would be at any cost to innocent life (e.g. at least two other known prior high speed chases).  Defendants cite *Scott v. Harris*, *supra*, 127 S.Ct. at 1778, as authority that, had Esquivel been permitted to steal the Perezes' vehicle and flee recklessly onto public streets, the potential danger to innocent lives was extreme.

In *Scott,* a police officer, Scott, terminated a high-speed pursuit of Harris's vehicle by applying his push bumper to the rear of the vehicle, causing it to leave the road and crash. Harris, rendered a quadriplegic, filed suit under Section 1983, alleging the use of excessive force in violation of the Fourth Amendment.  The Supreme Court held that, because the car chase Harris initiated posed a substantial and immediate risk of serious physical injury to others, Scott's attempt to terminate the chase by forcing Harris off the road was reasonable under the Fourth Amendment.  In so holding, the Supreme Court stated:

> Scott defends his actions by pointing to the paramount governmental interest in ensuring public safety, and respondent nowhere suggests this was not the purpose motivating Scott's behavior.  Thus, in judging whether Scott's actions were reasonable, we must consider this risk of bodily harm that Scott's actions posed to respondent in light of the threat to public safety that Scott was trying to eliminate.  Although there is no obvious way to quantify the risks on either

47

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18

        side, it is clear from the videotape that
respondent posed an actual and imminent
threat to the lives of any pedestrians who
might have been present, to other civilian
motorists, and to the officers involved in
the chase ... It is equally clear that
Scott's actions posed a high likelihood of
serious injury or death to respondent -
though not the near *certainty* of death posed
by, say, shooting a fleeing felon in the back
of the head, *see Garner* ... or pulling
alongside a fleeing motorist's car and
shooting the motorist ... So how does a court
go about weighing the perhaps lesser
probability of injuring or killing numerous
bystanders against the perhaps larger
probability of injuring or killing a single
person?  We think it appropriate in this
process to take into account not only the
number of lives at risk, but also their
relative culpability.  It was respondent,
after all, who intentionally placed himself
and the public in danger by unlawfully
engaging in the reckless, high-speed flight
that ultimately produced the choice between
two evils that Scott confronted.  Multiple
police cars, with blue lights flashing and
sirens blaring, had been chasing respondent
for nearly 10 miles, but he ignored their
warning to stop.  By contrast those who might
have been harmed had Scott not taken the
action he did were entirely innocent.  We
have little difficult in concluding it was
reasonable for Scott to take the action that
he did.

19    127 S.Ct. at 1778.

20        There is no question that Esquivel was attempting to steal

21    the Perezes' vehicle and further flee from the officers, that

22    Mrs. Perez was knocked down and dragged by the car while Esquivel

23    was attempting to reverse out of the driveway, and that he hit

24    and moved the pickup parked behind the car.  Nonetheless, there

25    was a pickup truck parked behind the car, police and police cars

26    at the scene or arriving at the scene.  It is questionable that

48

Esquivel could have actually gotten the car out of the driveway to continue his flight under these circumstances.   However, it is not disputed that Mrs. Perez was knocked down by the car door when the car was reversing (although her statement to the Internal Affairs Officers and to Mr. Hurd was that the car was reversing slowly).   At issue is whether Mrs. Perez was still in danger from the vehicle at the time the second, fatal, shot was fired.   The Perezes have given contradictory statements as to this issue.   Plaintiff presents no evidence that Officer Chavez, who was on the driver's side of the vehicle, observed, if it occurred, that Mrs. Perez had moved away from the vehicle and into the garage, out of immediate danger, seconds before he fired the second, fatal shot.[6]   Because of the Perezes' subsequent, contradictory statements, there is a question of fact whether Esquivel's attempt to steal the Perezes' vehicle posed an immediate threat to the safety of the officers or Mrs. Perez at

_____

[6]At the hearing, Plaintiff conceded that Officer Chavez fired the second, fatal, shot.   Plaintiff argued that Officer Grijalva may be found liable because he did not prevent Officer Chavez from firing that second shot.   Officer Grijalva was on the passenger side of the vehicle and could have seen Mrs. Perez move into the garage seconds before the second shot was fired if, in fact, Mrs. Perez did so.   Although an officer has a duty to intervene when a fellow officer violates the constitutional rights of a suspect or citizen, *United States v. Koon*, 34 F.3d 1416, 1447 n.25 (9th Cir.1994), *rev'd on other grounds*, 518 U.S. 81 (1996), an officer can be held liable for failing to intercede only if the officer had a realistic opportunity to intercede.   *Cunningham v. Gates*, 229 F.3d 1271, 1289-1290 (9th Cir.2000).   Here, Plaintiff presents no evidence that Officer Grijalva had a realistic opportunity to prevent Officer Chavez's' second shot, fired seconds after the first shot.   Summary judgment for Defendant Officer Grijalva is GRANTED.

the time of the second shot and whether or not Officer Chavez observed this, if it occurred, before he fired the second shot.

### 3.   Suspect Actively Resisting Arrest or Attempting to Evade Arrest by Flight.

The evidence is undisputed that Esquivel fled on foot while Officer Chavez was running the license check on Granados' vehicle.  It is undisputable that Esquivel was attempting to continue his flight by stealing the Perezes car.

A fleeing felon may or may not present a risk of deadly force to justify a deadly response by law enforcement.  The seizure of the Perezes' vehicle and risk to Mrs. Perez has the potential to threaten deadly force to Mrs. Perez.  Her additional description of events where she claims to have moved to a position of safety, if this occurred, may or may not have been observable to Officer Chavez, who was on the driver's side of the vehicle.  Because what occurred when the second shot was fired, i.e., whether or not Mrs. Perez had moved to a position of safety in the garage seconds before the second shot was fired and whether or not Officer Chavez was aware that she had done so if she did, summary judgment on the claim of excessive force and the issue of qualified immunity is DENIED.

### E.   42 U.S.C. § 1985.

The Complaint alleges it is brought pursuant to Section 1985 as well as Section 1983.  The Complaint does not specify which subparagraph of Section 1985 is involved.

Section 1985(2) makes unlawful a conspiracy to deter any

party or witness from attending federal court or testifying in federal court *or* a conspiracy to obstruct justice in any state court with the intent of depriving any citizen of the equal protection of the laws.  Section 1985(2) contains two clauses that give rise to separate causes of action.  To state a claim under the first clause of Section 1985(2), plaintiffs must allege the following elements: (1) a conspiracy by the defendants; (2) to injure a party or witness in his person or property; (3) because he attended federal court or testified in any matter pending in federal court; (4) resulting in injury or damages to the plaintiff.  There is no requirement of class-based animus to state a claim under the first clause of Section 1985(2).  *See Portman v. County of Santa Clara*, 995 F.2d 898, 909 (9th Cir. 1993).  To state a claim under the second clause of Section 1985(2), the plaintiff must allege (1) a conspiracy by the defendants; (2) to impede, hinder, obstruct, or defeat the due course of justice in a state court; intending to deprive any citizen of the equal protection of the laws, i.e., that defendants acted with class-based animus.  *Portman, id.*; *Bretz v. Kelman*, 773 F.2d 1026, 1029 (9th Cir. 1985).

"To prove a violation of § 1985(3), [Plaintiff] must show 'some racial, or perhaps otherwise class-based, *invidiously discriminatory animus* behind the conspirators' action.  The conspiracy, in other words, *must aim at* a deprivation of the equal enjoyment of rights secured by the law to all.'"  *Orin v. Barclay*, 272 F.3d 1207, 1217 (9th Cir.2001), quoting *Griffin v.*

1    *Breckenridge*, 403 U.S. 88, 102 (1971).

2      Defendants, in a footnote at the conclusion of their opening

3 brief, argue that a conspiracy claim will not survive "where, as

4 here, the officers' conduct was done in the open and there is no

5 evidence of any requisite racial animus."

6      Plaintiff has not opposed summary judgment for Defendants on

7 her Section 1985 claim.  From this lack of response it is

8 concluded that Plaintiff concedes summary judgment for Defendants

9 on the Section 1985 claim.  Defendants motion for summary

10 judgment on the Section 1985 claim is GRANTED.

11      F. <u>Liability of City of Sanger</u>.

12      Defendants move for summary judgment in favor of the City of

13 Sanger on the ground that, if the individual officers are

14 entitled to qualified immunity, the City of Sanger cannot be held

15 liable for any alleged constitutional violation.

16      Defendants cite *Los Angeles v. Heller*, 475 U.S. 796 (1986).

17 *Heller* does not support Defendants' position.  In *Heller*, the

18 Supreme Court held: "If a person has suffered no constitutional

19 injury at the hands of the individual police officer, the fact

20 that the departmental regulations might have *authorized* the use

21 of constitutionally excessive force is quite beside the point."

22 475 U.S. at 799.  As explained in *Sunn v. City & County of*

23 *Honolulu*, 852 F.Supp. 903, 907 (D.Hawaii 1994):

24           In the present case, the officer defendants
            were not exonerated from liability.  Rather,

25             the officer defendants successfully asserted
            qualified immunity ....

26

There is no Ninth Circuit case law on the applicability of *Heller* to this particular situation.  However, the circuits which have considered the issue have held that *Heller* is inapplicable to cases where police officers are exempt from suit on qualified immunity grounds.  *Doe v. Sullivan County, Tenn.*, 956 F.2d 545, 554 (6th Cir.1992); *Barber v. City of Salem, Ohio*, 953 F.2d 232 (6th Cir.1992); *Parrish v. Luckie*, 963 F.2d 201, 207 (8th Cir.1992); *Medina v. Denver*, 960 F.2d 1493, 1499-1500 (10th Cir.1992).

In *Doe*, the Sixth Circuit reasoned that dismissal of claims based on qualified immunity did not necessarily imply that the plaintiff had suffered no constitutional deprivation and only implied that officers could reasonably have believed that their conduct did not violate clearly established law.  *Doe*, 956 F.2d at 554.  Accordingly, dismissal of a claim against an officer asserting qualified immunity in no way logically entails that the plaintiff suffered no constitutional deprivation, nor correspondingly, that a municipality - which is not entitled to qualified immunity - may not be liable for that deprivation.  *Id.; Medina*, 960 F.2d at 1499; *see also Todd*, 963 F.2d at 207 (*Heller* inapplicable if plaintiff's constitutional rights were violated).  At most, it means that an officer in the defendant's position could reasonably have believed that the conduct in question did not violate the law that was clearly established at that time.  *Id.*  A municipality may nonetheless be liable if the actions complained of rises to the level of a constitutional violation in light of present law ... Absent any Ninth Circuit case law on point, the court will follow the well reasoned decisions of other circuits in holding that *Heller* is inapplicable to cases where police officers are exempt from liability on the basis of qualified immunity.

*See also Gibson v. County of Washoe, Nev.*, 290 F.3d 1175, 1186 n. 7 (9th Cir.2002), *cert denied*, 537 U.S. 1106 (2003):

The municipal defendants ... assert that if

> we conclude, as we do ..., that the
> individual deputy defendants are not liable
> for violating Gibson's constitutional rights,
> then they are correspondingly absolved of
> liability.  Although there are certainly
> circumstances in which this proposition is
> correct ..., a municipality may be liable if
> an individual officer is exonerated on the
> basis of the defense of qualified immunity,
> because even if the officer is entitled to
> immunity a constitutional violation might
> still have occurred.  *See, e.g., Chew v.
> Gates*, 27 F.3d 1432, 1438-39 (9th Cir.1994)
> ....

Defendants also move for summary judgment in favor of the

City of Sanger on the ground that "Plaintiff has zero evidence to

support any so-called *Monell* claim against the City."[7]

The Complaint alleges that the City of Sanger's

> liability under federal law stems from its
> unconstitutional customs and policies, which
> will be specified at a later point in this
> proceeding, as permitted by applicable law.
> Plaintiffs [sic] are informed and believe
> that, through these unconstitutional customs
> and policies, SANGER encouraged both the
> overt misconduct of the individual defendant
> officers, by which the decedent was
> victimized, as well as the substantial acts
> and omissions of the defendant officers to
> conceal their overt misconduct.

Local government entities and local government officials

acting in their official capacity can be sued for monetary,

declaratory, or injunctive relief, but only if the allegedly

unconstitutional actions took place pursuant to some "policy

statement, ordinance, or decision officially adopted and

_____

[7]Plaintiff's opposition incorrectly asserts that the "sole
defense argument in favor of summary judgment on behalf of the City
of Sanger is that there must be underlying individual liability."
Plaintiff has misread Defendants' motion.

54

promulgated by that body's officers...." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978).  Alternatively, if no formal policy exists, plaintiffs may point to "customs and usages" of the local government entity.  *Id*.  A local government entity cannot be held liable simply because it <u>employs</u> someone who has acted unlawfully.  *Id*. at 694.  *See also Haugen,* 351 F.3d at 393 ("Municipalities cannot be held liable under a traditional respondeat superior theory. Rather, they may be held liable only when "action pursuant to official municipal policy of some nature caused a constitutional tort.... [T]o establish municipal liability, a plaintiff must prove the existence of an unconstitutional municipal policy.").

        To prevail in a civil rights claim against a local government under *Monell*, a plaintiff must satisfy a three-part test:

>            (1)   The local government official(s) must
>                  have intentionally violated the
>                  plaintiff's constitutional rights;
>
>            (2)   The violation must be a part of policy
>                  or custom and may not be an isolated
>                  incident; and
>
>            (3)   There must be a link between the
>                  specific policy or custom to the
>                  plaintiff's injury.

*Id*. at 690-92.  There are a number of ways to prove a policy or custom of a municipality.  A plaintiff may show (1) "a longstanding practice or custom which constitutes the 'standard operating procedure' of the local government entity;" (2) "the decision-making official was, as a matter of state law, a final

policymaking authority whose edicts or acts may fairly be said to represent official policy in the area of decision;" or (3) "the official with final policymaking authority either delegated that authority to, or ratified the decision of, a subordinate." *Menotti v. City of Seattle*, 409 F.3d 1113, 1147 (9th Cir. 2005). The Ninth Circuit has held that a municipal policy "may be inferred from widespread practices or evidence of repeated constitutional violations for which the errant municipal officers were not discharged or reprimanded."  Id.

A municipality may still be liable under *Monell* for a single incident where: (1) the person causing the violation has "final policymaking authority;" (2) the "final policymaker" "ratified" a subordinate's actions; or (3) the "final policymaker" acted with deliberate indifference to a subordinate's constitutional violations.  *Christie v. Iopa*, 176 F.3d 1231 (9th Cir. 1999).

Plaintiff presents no evidence whatsoever from which it may be inferred that any of these standards have been violated. Summary judgment for the City of Sanger is GRANTED

CONCLUSION

For the reasons stated:

1.  Defendants' motion for summary judgment is GRANTED IN PART AND DENIED IN PART:

        a.  Summary judgment is GRANTED for Defendants City of Sanger Police Officer Eric Grijalva, City of Sanger Police Sergeant Fred Sanders, and the City of Sanger;

        b.  Summary judgment is GRANTED for Defendants on

56

Plaintiff's claim for violation of 42 U.S.C. § 1985;

     c.  Summary judgment is DENIED for Defendant City of Sanger Police Officer Manuel Chavez for the use of deadly force in violation of 42 U.S.C. § 1983 and for qualified immunity from liability based on his use of deadly force.

    2.  Counsel for Defendants shall prepare and lodge a form of order reflecting the rulings set forth in this Memorandum Decision immediately following the date of service of this Memorandum Decision.

    IT IS SO ORDERED.

Dated:   __November 3, 2008__       _____/s/ Oliver W. Wanger_____
                                   UNITED STATES DISTRICT JUDGE